# COPY OF TRANSCRIPT

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

TRACEY L. JOHNSON AND DAVID JAMES, JR.     PLAINTIFFS

VERSUS     CIVIL ACTION NO. 2:10-CV-00036-WAP-SAA

CITY OF SHELBY, MISSISSIPPI, AND
HAROLD BILLINGS     DEFENDANTS

## *DEPOSITION OF TRACEY JOHNSON*

*APPEARANCES*:

    *LUTHER C. FISHER IV, ESQUIRE*
    Waide & Associates
    332 North Spring Street
    Tupelo, Mississippi 38804

        *REPRESENTING THE PLAINTIFFS*

    *LATOYA C. MERRITT, ESQUIRE*
    Phelps Dunbar
    4270 I-55 North
    Jackson, Mississippi 39211

        *REPRESENTING THE DEFENDANTS*

*ALSO PRESENT*: David James, Jr.

Taken at the instance of the Defendants
At Shelby City Hall
305 3rd Street
Shelby, Mississippi
On March 30, 2011, at 1:34 p.m.

*REPORTED BY:*   SHAUNA W. STANFORD, CSR
                CSR NO. 1380



EXHIBIT 4

(601) 825-6339    Fax (601) 825-1___
P. O. Box 1731, Jackson, MS 392__
www.sharronallen.com

1      A.     A police officer.
2      Q.     Police officer. And who was your supervisor
3 at Delta State?
4      A.     Chief Ben. What's Ben's last name? I don't
5 know his last name.
6      Q.     Okay. But he's the chief of the University's
7 police department?
8      A.     He's the assistant chief.
9      Q.     Assistant chief. And how much were you
10 making at Delta State?
11     A.     It all depends. From 9 to $16 an hour.
12     Q.     Okay. What does it depend on?
13     A.     What kind of games that was going on. Each
14 game or each function had a different price, basically.
15     Q.     Were you only working for certain events that
16 they were having on campus?
17     A.     Right.
18     Q.     Are you still working as needed for events on
19 campus?
20     A.     Yes.
21     Q.     In this lawsuit to which you are a plaintiff,
22 you brought a claim against Mr. Billings for malicious
23 interference with employment. Is that correct?
24     A.     Yes, ma'am.
25     Q.     In response to some discovery requests, you

1  stated a couple of facts that you're relying upon for
2  that claim, and I want to go through those with you.
3  Okay?
4     A.   Okay.
5          MR. FISHER: I apologize. Before we jump
6     into that, can I use the restroom?
7          MS. MERRITT: Yeah. We can take a break.
8                    (OFF THE RECORD)
9  BY MS. MERRITT:
10    Q.   One of the statements that you made in
11 response to interrogatories that were propounded to you
12 was that during the time of your employment, that
13 Defendant Billings was the operator and owner of a
14 local nightclub where much criminal activity had
15 occurred.
16         Do you remember making that statement?
17    A.   Give me the statement again.
18    Q.   You stated that during the time that you were
19 employed as a police officer, that Defendant Billings,
20 in addition to being an alderman, also was the owner
21 and operator of a local nightclub where much criminal
22 activity occurred.
23    A.   Yes, ma'am.
24    Q.   Okay. What type of criminal activity were
25 you referring to in that response?

1    A.    Drugs, strippers.
2          MR. FISHER:  I'm sorry?
3          THE WITNESS:  Strippers.
4    BY MS. MERRITT:
5    Q.    Strippers?
6    A.    Yeah.  Alcohol.  Gang members would meet up
7    and have altercations, and different scenarios like
8    that.
9    Q.    Okay.  As it relates to drugs, did you ever
10   arrest anyone for drugs inside of Billings Lounge?
11   A.    It's no.  But when we had to do our job at
12   Billings, our job would always be jeopardized -- would
13   be in jeopardy, so we had to see and don't see in most
14   incidences.
15         And when I rode with Officer James, he would,
16   like -- he would call us to come do a walk in -- a walk
17   through the club.  But there was one entrance in, and
18   it always consists of over 200 people be in the club,
19   so it was like back to back.  So by us not having
20   enough manpower, we didn't -- you know, just didn't
21   carry on a lot of function down there.
22   Q.    Was the answer to my question no about you
23   arresting folks for drugs in Billings Lounge?
24   A.    Right.
25   Q.    Okay.  As it relates to strippers, did you

1  your job was always in jeopardy at Billings' club.
2  Tell me what you mean by that.
3      A.   If you -- if you go down -- if you go to the
4  call -- if you go in his area and it's something going
5  on out of text and you try to arrest somebody, he will
6  then come towards the meetings and always try to have
7  me fired, or he'll have -- talking to the other
8  aldermen about different allegations that their -- that
9  the other people supposed to be making against me.
10     Q.   So are you talking about the fact that
11 Mr. Billings made a motion and voted for your
12 termination?
13     A.   Yes.
14               (EXHIBIT 9 MARKED)
15 BY MS. MERRITT:
16     Q.   You have been handed, Ms. Johnson, what is
17 Composite Exhibit No. 9 to your deposition, and these
18 are offense reports that were submitted to us through
19 your counsel in response to incidents that you may have
20 been involved in that occurred at Billings Lounge.  And
21 I will tell you that they are Bates stamped; but,
22 apparently, when they made the copies, the number is
23 not on there.
24          Do you see that?
25     A.   Something could be down here.

1  A. No.
2  Q. Okay. And I guess that was my question,
3  whether or not y'all had had conversations specific to
4  this incident involving Calvin Davis.
5  A. It was after the Calvin Davis incident.
6  Q. But it was not related to the Calvin Davis
7  incident. Is that correct?
8  MR. FISHER: Object to the form.
9  A. Well, I could say it was related to -- all of
10 this came down to the same thing. It was just my
11 opinion.
12 BY MS. MERRITT:
13 Q. Did he specifically mention the Calvin Davis
14 incident?
15 A. No.
16 Q. Okay. Did he specifically ask you to not
17 pursue charges against Calvin Davis?
18 A. Well, he told -- he advised me not to be in
19 cahoots -- as his words is -- with Officer James on
20 making arrests.
21 Q. At that time was Mr. Davis or his arrest
22 specifically mentioned?
23 A. It was -- well, I -- what was your question
24 again? Was it --
25 Q. When you had the alleged conversation with

1  A.  Yes, ma'am.

2  Q.  Did it occur at the Double Quick?

3  A.  Yes, ma'am.

4  Q.  Was anybody else present during this
5  conversation other than yourself and Mr. Billings?

6  A.  No, ma'am.

7  Q.  And what was stated by Mr. Billings during
8  your first conversation?

9  A.  I can't put these conversations in probably
10 one, two, three, four. But one incident, he -- we
11 talked. He discussed he wanted me to help him get some
12 lowdown -- as he say -- on Officer James. He advised
13 me not to be in the patrol car with Officer James at
14 one time. One incident we talked about if I get him
15 some -- something on Officer James, that he'll ensure
16 me that I keep my job.

17 Q.  Okay. The first conversation that I think
18 you described was a conversation where he wanted to get
19 the lowdown on Officer James?

20 A.  Right.

21 Q.  What do you mean by "lowdown"? What was he
22 asking you?

23 A.  And then it's just my opinion --

24 Q.  Okay.

25 A.  -- that he wanted -- wanted me to say that

1  was a lot of accusations made towards Officer James and
2  myself, and different people -- and I can't
3  specifically say their names -- but was telling me what
4  they planned to do to Officer James, and I didn't need
5  to be in the company of him.
6      Q.  Okay.  Mr. Billings didn't tell you that he
7  planned to do anything to Officer James, did he?
8      A.  No.
9      Q.  Did you say that after the riot -- are you
10 talking about the riot in Pride Garden Apartments?
11     A.  Pride Garden, yes.
12     Q.  Were there citizens that appeared to have a
13 problem with yourself and Officer James?
14     A.  Yes.
15     Q.  And was it your understanding that there were
16 citizens who may have been planning to do something to
17 Officer James?
18     A.  Yes, ma'am.  It had gotten so bad that we had
19 to -- when we took our breaks, we had to be side by
20 side facing -- one patrol car was facing one direction
21 and the other car was facing the other direction,
22 because it was always something going on.
23     Q.  Something going on with citizens here in
24 Shelby?
25     A.  Yes, ma'am.

1  Q. During the conversation that you had with
2  Mr. Billings, did he ever threaten to do anything to
3  you physically?
4  A. No.
5  Q. Okay. And I think the last conversation that
6  you stated was that Mr. Billings said if you get him
7  something on Officer James, he would ensure that you
8  keep your job. Is that right?
9  A. He ensure that I keep my job? Yes, ma'am.
10 Q. And when he said get him something on Officer
11 James, what did you believe he was talking about?
12 A. I can only assume that he was pre- -- I guess
13 it was just, like, for instance, wanted me to inform
14 him what Officer James knew about several drug dealers
15 in the Shelby area. Because Officer James used to be
16 with the district attorney, and all of them infuriated
17 was in fear that Officer James going to roll down on
18 them and bust them. Because on every corner pretty
19 much in Shelby there is a drug activity going on. And
20 so Officer James and myself, by us working the night
21 shift, we was aware of different situation that was
22 going on.
23 Q. When you spoke with -- in your conversations
24 with Mr. Billings, did he specifically ask you not to
25 take certain action regarding alleged drug dealers?